**Thomas G. LOVETT, Trustee of the Bankruptcy Estate of John Peterson Motors, Inc.,**

**Donald John Peterson, individually, Appellant,**

v.

**GENERAL MOTORS CORPORATION, Appellee.**

**No. 91–2646.**

United States Court of Appeals, Eighth Circuit.

Submitted: May 15, 1992.

Decided Sept. 16, 1992.

---

Ronald B. Sieloff, St. Paul, Minn., for appellant.

James S. Simonson, Minneapolis, Minn., argued (William B. Slowey and Steven J. Cernak, on the brief), for appellee.

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

FAGG, Circuit Judge.

John Peterson Motors, Inc. (JPM), a car dealership, and Donald John Peterson (Peterson), JPM's owner and operator, brought this antitrust action against General Motors Corporation (GM) in 1985. While the case was pending that year, JPM's bankruptcy proceeding converted to chap-

ter seven and Peterson lost control of JPM's antitrust suit. Peterson, however, continued to pursue individual antitrust damages. After a nine-week trial, a jury found that GM conspired with JPM's rival GM dealers to restrict distribution of vehicles to JPM for the purpose of maintaining retail prices, in violation of section one of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988). The jury awarded separate damages to JPM's bankruptcy trustee and Peterson. GM moved for judgment notwithstanding the verdict (JNOV). The district court denied GM's motion with respect to JPM. *Lovett v. General Motors Corp.*, 769 F.Supp. 1506, 1522 (D.Minn.1991). The district court granted GM's motion with respect to Peterson, however, concluding Peterson lacked standing to bring a private damage action. *Id.* at 1508 n. 4, 1522. Peterson appeals, and we affirm.

■ Peterson asserts he has standing under section four of the Clayton Act, 15 U.S.C. § 15 (1988), to maintain a private damage action against GM. Under section four, persons injured in their "business or property by reason of anything forbidden in the antitrust laws may sue" in federal district court and recover treble damages. 15 U.S.C. § 15(a) (1988); *Midwest Communications, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 449–50 (8th Cir.1985), *cert. denied*, 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). Although the statute literally confers the right to sue on anyone claiming an injury causally related to an antitrust violation, the Supreme Court has prescribed standing factors narrowing the class of persons entitled to recover private damages under section four. *Midwest Communications*, 779 F.2d at 450; *Peck v. General Motors Corp.*, 894 F.2d 844, 846 (6th Cir.1990). These factors are:

> (1) [t]he causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; [and] (6) [t]he risk of duplicate recoveries or complex damage apportionment.

*McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir.1983) (drawing factors from *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535–45, 103 S.Ct. 897, 907–12, 74 L.Ed.2d 723 (1983)), *cert. denied*, 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984); *see Peck*, 894 F.2d at 846 (listing same factors in a different way). In a factually similar case, the Sixth Circuit applied these factors and concluded the sole owner of a car dealership lacked standing to bring a private antitrust action against the manufacturer primarily because the owner's lost employment income and personal investments were derivative of antitrust injury to the dealership. *Peck*, 894 F.2d at 846–48. We generally agree with the Sixth Circuit's reasoning, but find analysis of all six factors unnecessary in Peterson's case.

■ Within the framework of the six factor analysis, we have recognized a potentially dispositive point: a federal antitrust plaintiff who has not suffered an "antitrust injury" lacks standing. *Midwest Communications*, 779 F.2d at 450 & n. 6; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977). An antitrust injury is a loss that Congress intended to prevent with the antitrust laws and that flows from the unlawfulness of the defendant's acts. *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 698; *see Midwest*, 779 F.2d at 450–51.

■ Peterson contends he has suffered an antitrust injury because he lost everything as a result of GM's acts. We disagree. " '[A] mere causal connection between an antitrust violation and harm to [Peterson] cannot be the basis for antitrust compensation unless the injury is *directly* related to the harm the antitrust laws were designed to protect.' " *Midwest Communications*, 779 F.2d at 451 (emphasis added) (quoting *McDonald*, 722 F.2d at 1374). Peterson must have been "the target of the anticompetitive activity, 'not one who has merely suffered indirect, secondary, or remote injury . . . .' " *Id.* (quoting *Midwest-*

*ern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710 (11th Cir.1984) (per curiam)). In short, consequential injury is not an antitrust injury. *See Midwestern Waffles*, 734 F.2d at 710–11.

Peterson seeks damages as JPM's sole owner, director, chief executive officer, designated dealer-operator, facilities landlord, equipment lessor, investor, and debt guarantor. Peterson contends that as a result of GM's antitrust violations, "JPM was not delivered motor vehicles; JPM was forced out of business and into bankruptcy; and as a direct consequence of this, [Peterson] lost his rental income, wages, dividends and cash flow from his dealership. As a result of this, [Peterson] lost virtually everything of value that he owned, his personal and business reputation were ruined and deficiency judgments were entered against him." (Appellant's Br. at 16.) At trial, experts testified that Peterson's losses included: loss of the dealership land and building owned by Peterson and leased to JPM; loss of Peterson's home because he could not pay his mortgage; loss of Peterson's personal interest in a family investment partnership pledged to General Motors Acceptance Corporation; loss of Peterson's automobile leasing business; deficiencies on foreclosure and sale of the dealership real estate; federal taxes owed by JPM assessed against Peterson; and loss of dividends and income from automobile leasing.

Although Peterson undoubtedly suffered injuries as a result of GM's actions, his injuries were a derivative consequence of JPM's injuries. None of the injuries were inflicted directly on Peterson by GM's alleged anticompetitive conduct. Instead, the injuries are a direct result of JPM's failure. Peterson's own explanation of his injuries shows that JPM was the target of GM's anticompetitive activity and that Peterson's injuries are simply an indirect result. In sum, Peterson's damages are incidental to the alleged antitrust activity and not the type of loss Congress intended to prevent with the antitrust laws. *See Midwestern Waffles*, 734 F.2d at 711; *see also Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir.1987) ("derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing").

Peterson contends his injuries are the type Congress intended to prevent because they are "inextricably intertwined with the injury [GM and the rival GM dealers] sought to inflict." *Blue Shield v. McCready*, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982). Peterson has not shown GM and the rival GM dealers actively manipulated him to injure competitors or participants in the relevant market. Thus, he cannot prevail on this theory. *See Peck*, 894 F.2d at 847.

Because Peterson has not shown he suffered an antitrust injury, he lacks federal antitrust standing. *Midwest Communications*, 779 F.2d at 451; *Southwest Suburban Bd. of Realtors*, 830 F.2d at 1377. This conclusion is in harmony with the numerous cases routinely denying antitrust standing to a corporation's sole shareholders, officers, employees, lessors, guarantors, and creditors. *E.g.*, *Peck*, 894 F.2d at 847–48 (car dealership's sole owner/president and vice-president lacked standing because lost employment income and personal investments were derivative of dealership's antitrust injury); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439–40 (9th Cir.1979) (car dealership's president/sole stockholder/guarantor lacked standing); *Jones v. Ford Motor Co.*, 599 F.2d 394, 397–98 (10th Cir.1979) (car dealership's shareholders and employees lacked antitrust standing because the dealership itself was injured); *Ragar v. T.J. Raney & Sons*, 388 F.Supp. 1184, 1186 (E.D.Ark.) (stating in dicta that corporate shareholders, employees, and creditors lack antitrust standing), *aff'd*, 521 F.2d 795, 796 (8th Cir. 1975); *Midwestern Waffles*, 734 F.2d at 710–11 (officer/employee/stockholder lacked antitrust standing); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1088 (6th Cir.1983) (lessors of a commercial entity lacked standing to sue on the ground that the lessee was harmed).

Nevertheless, Peterson contends he has standing because JPM was his alter ego. We disagree. Peterson failed to show that JPM did not maintain a separate corporate existence. *See Sherman*, 601 F.2d at 439–40. Even if Peterson were JPM's alter ego, Peterson would only have standing to assert the corporation's antitrust claims, which the bankruptcy trustee pursued. *Peck*, 894 F.2d at 848.

A district judge partially granting and partially denying GM's motion to dismiss in 1985 concluded Peterson had standing to proceed individually. *John Peterson Motors, Inc. v. General Motors Corp.*, 613 F.Supp. 887, 901–03 (D.Minn. 1985). The judge reasoned that JPM might be Peterson's alter ego, and the corporate entity might not remain to pursue the claims against GM after the bankruptcy proceedings concluded. *Id.* at 902–03. In 1989, another district judge ruling on GM's motion for summary judgment also concluded Peterson had standing. *Neill v. General Motors Corp.*, Civil No. 4–85–139, at 7–8 (D.Minn. Sept. 18, 1989) (unpublished order granting and denying summary judgment). Although JPM's bankruptcy estate was pursuing the action against GM, the court based its conclusion on the "other reasons identified in the [earlier order deciding GM's motion to dismiss]." *Id.* at 8. Peterson contends the "law of the case" doctrine prevented the district court from later redeciding the standing issue on GM's motion for JNOV.

The law of the case doctrine provides that a court's decision on legal issues should govern the same issues in later stages of the same case. *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). The doctrine, however, applies only to issues decided by final judgments. *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 286 n. 16 (8th Cir.1986); *In re Unioil, Inc.*, 962 F.2d 988, 993 (10th Cir. 1992). The district court's rulings on GM's motion to dismiss and motion for summary judgment were not final judgments. *See Bullock v. Baptist Memorial Hosp.*, 817 F.2d 58, 59 (8th Cir.1987) (order dismissing complaint against some but not all defendants is not a final order); *Wright v. South Ark. Regional Health Center, Inc.*, 800 F.2d 199, 202 (8th Cir.1986) (denial of summary judgment motion is usually not a final order); Fed.R.Civ.P. 54(b) (judgment on multiple claims or involving multiple parties). Further, a district court may properly depart from an earlier holding "if convinced that it is clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. at 618 n. 8, 103 S.Ct. at 1391 n. 8. When a district court is convinced that it incorrectly decided a legal question in an interlocutory ruling, the district court may correct the decision to avoid later reversal. *In re Unioil*, 962 F.2d at 993. Here, the district court's earlier reasons for allowing Peterson to proceed individually had evaporated by the time the district court ruled on GM's motion for JNOV.

We conclude that until the district court entered judgment on all claims after trial, the district court could reconsider its earlier rulings deciding the standing issue in Peterson's favor. *Id.* In any event, the law of the case doctrine does not prevent us from reviewing the district court's standing decision on appeal. *In re 949 Erie St., Racine, Wis.*, 824 F.2d 538, 541–42 (7th Cir.1987).

Accordingly, we affirm.